## Fix v. Isaacs' Administrators.
### (Decided March 24, 1933.)

JOSEPH J. HANCOCK and C. C. TURNER for appellant.

R. F. PEAK, JOSEPH S. LAURENT and GORDON & LAURENT for appellees.

OPINION OF THE COURT BY JUDGE PERRY—Reversing.

On July 16, 1929, E. G. Isaacs recovered a judgment for $13,296.50, with interest from November 19, 1926, against C. C. Fix, F. A. Murphy, and W. M. Mitchell. Thereafter, Isaacs died, and D. B. Cornett and E. G. Isaacs, Jr., in July, 1930, were appointed and qualified as administrators of his estate.

On December 15, 1930, Fix appealed from this judgment against him, and, upon his petition filed in this court, the action was ordered revived as against the said administrators.

In April, 1927, Isaacs sued C. C. Fix, F. A. Murphy, and W. M. Mitchell upon a note, dated November 19, 1926, of the Louisville Petroleum Refining Company, signed by them as sureties.

This refining company, the principal debtor on this note, had either then failed or did so soon thereafter, and it appears no effort was ever made by any one to make it a party to this litigation, seeking recovery on this note.

This cause was transferred to, and tried in, equity.

It is disclosed by the record that on January 15, 1926, the Louisville Petroleum Refining Company, having very pressing obligations, and being in a very straitened financial condition, borrowed $15,000 from the Citizens' Union National Bank of Louisville for three months, upon the understanding that this loan might be renewed in part for a further three months, if a substantial part of it was paid when due.

Upon its maturity, $7,500 was paid by the company on this note, and its new note for the remaining $7,500 was executed on April 15, 1926, to mature on July 15, 1926, on which $500 was paid by the company before its maturity.

It is further disclosed by the record, and undisputed, that W. M. Mitchell, F. A. Murphy, C. C. Fix, Jno. A. Wathen, and E. G. Isaacs were, in January, 1926, the directors of the Petroleum Refining Company, Mitchell and Murphy being its president and secretary-treasurer, and that upon their finding urgent necessity, due to the then financial condition of their company to secure the $15,000 loan from the bank, and which they were required to sign as sureties the company's note given therefor, they made and signed an agreement

with each other, reciting therein the execution of this note, and further agreeing to and defining their respective and mutual obligations for its payment as follows:

"It is hereby further agreed by and between the signers hereto, that in the event the refining company should from any cause default in payment of the said note to the said bank, that then in that event each signer, as surety, shall pay his pro rata share of the said $15,000, viz., $3,000.00 each, and it is further agreed that in the event that anyone of the said signers, as surety, shall fail to pay their pro rata share, that then in that event those of the said endorsers shall have the right to collect from the said delinquent his pro rata share as hereinabove described."

About June 15, 1926, when the company's renewal note given the bank for $7,000 (such amount representing the balance due upon this earlier January loan of $15,000) became due, a conference was had between Mitchell, Murphy, and Isaacs (at which Fix was not present), sureties upon the note, looking to making some arrangement for its payment.

It was known to them that the company's financial condition was such that it could not pay the note, and Mitchell and Murphy sought to make an agreement with Isaacs to pay to the bank this debt for the company, and to lend it $6,000 additional as necessary working capital.

The evidence is that it was arranged at this conference with Isaacs that he, for a bonus of $500, would pay the banks $7,048 debt, and "furnish the company" as additional working capital also the desired sum of $6,000 with which to continue its operations and meet its pressing current obligations, and that the company would give him therefor its note for $13,500 (including the bonus), which was to be signed by Mitchell, Murphy, and the appellant, Fix, and other directors as sureties thereon. The note so given was to become due and payable in sixty days.

It is testified by Mitchell and Murphy that Isaacs insisted, when conferring with them as to this arrangement, that he should be allowed to satisfy out of this $6,000, he was to advance the company as working capi-

tal and included in and provided for by the proposed new note, some stock subscriber's notes, or obligations of the company, which he had bought up and then held against it.

When this new note was presented to Fix for his signature as a surety thereon, Fix, upon seeing that the note was not drawn as only a renewal note for the $7,000 debt of the oil company then due and owing the bank, upon which he and Isaacs, together with the other directors, were each and all sureties, but was one for the larger and different amount of $13,500, made payable to Isaacs, inquired of him why the note was made for this larger amount and why made payable not to the bank but to him, when Isaacs answered: "You know how it is, you know how it is, it is all the time, every time you turned around, every time you go to a meeting, you have to have some money," and further said, "I am taking up this bank balance, and the rest of it I am putting into the bank in cash. They have to have some money."

Then Fix said to him: "I see this note is made payable to you; I was not up to the meeting and I never heard this note discussed and I did not know just how they had agreed to handle the matter."

And Isaacs then said: "Yes, I have to get the money."

Thereupon Fix said: "Are you going to be obligated on this note according to the original agreement?"

To which Isaacs answered: "I have got to sign that note or else I cannot get the money."

Then Fix said to him: "Is John Wathen going to sign this note?"

Isaacs answered: "John Wathen is going to sign it too."

Then Fix said: "If that is according to the agreement and everybody has agreed to that thing, and everybody will do that thing I will sign this note, but understand if this is not according to the agreement, and everybody does not sign this note my signature does not go."

This note of $13,500 was accordingly executed by the oil company to Isaacs on June 19, 1926, by its terms.

due two months after date and bearing the signatures of W. M. Mitchell, F. A. Murphy, and C. C. Fix as sureties.

On August 19, 1926, this note was renewed for three months, the renewal being signed in the same way.

When the renewal note matured, the company paid accrued interest upon it and $203.50 on the principal, and gave its new note, dated November 19, 1926, for $13,296.50 to Isaacs, also signed and secured in the same way as was the note of June 19, 1926.

Isaacs did not surrender the note of June 19, 1926, when it was renewed by them on August 19, 1926, nor did he surrender their later renewal note of August 19, 1926, when it was renewed, on November 19, 1926. The note of August 19, 1926, and the November renewal note sued on were identical with the note of June 19, 1926, with the exception of their dates and the stated change in the amount of the last note.

On July 15, 1926, Isaacs gave his check to the Citizens' Union National Bank for $7,048.40 in payment of the balance due it on the company's note dated April 15, 1926, signed by him and appellant as sureties.

The Louisville Petroleum Refining Company was undercapitalized and, it appears, was, at the time of these borrowing transactions, in severe financial straits, and about the first of the year 1928 was finally forced into bankruptcy.

In an effort to raise the sorely needed capital, the company endeavored to sell stock in its company, and often took notes of purchasers for its capital stock thus sold. None of the banks in Louisville, it appears, would discount these notes, and often Fix, Isaacs, and others would take these stock notes from the company at a discount, and the notes were indorsed to them by the company. Some of the notes thus taken for stock subscriptions were not paid by the subscribers when due, and these notes were turned back on the company, thus adding to its embarrassment. These notes will be hereinafter referred to for brevity as "stock subscribers notes."

An analysis of the record's very voluminous, vexed, and conflicting evidence, given by many and repeated depositions of the parties herein, leads us to the con-

clusion that these parties' execution of the company's notes to the bank and to Isaacs, in their various transactions had on behalf of their badly involved petroleum company, all represent their practice and efforts as its officers and directors to keep their crippled concern going, by their suretyship for it and were made and entered into by them with the manifest purpose and in keeping with the spirit and terms of their earlier agreement had between themselves in January, 1926, to the effect that, in the event the refining company should default in the payment of its thus secured $15,000 then executed note to the bank, upon which they were each sureties, each of them, as such, would pay his pro rata share thereof, and, upon the failure of any surety to so pay his share, they, the indorsers, should have the right to collect from such delinquent his pro rata share thereof. In other words, it appears, such an operating plan was agreed on between them, as the directors of this company and as indorsers upon its notes, that such surety engagements were made by them, with the understanding that each became liable for and should pay respectively his proportional part of the company's loans secured by their suretyship.

We are further of the opinion, based upon the record's very conflicting proof, that such was likewise here the reasonable understanding and intended action of the parties when they signed as sureties this note in question to Isaacs for $13,500, and that Fix, inasmuch as their previous dealings as directors of the company had been that they were jointly acting as such in protection of their interests in the company, and that each of them was to bear his pro rata share of the liability thus incurred, did reasonably rely upon such customary understanding in signing the company's notes with which to provide funds for its continued operation. Therefore Fix was justified, by reason of such existing practice between these fellow officers, when asked by them to sign the note in question, in believing he was signing it with the same liability attaching as upon his like previous action in signing its prior notes and in accepting the alleged assurance and representation of Isaacs that this note represented only the further like effort of the directors of the company, as a feasible plan or method adopted by them, for paying off their then obligation owing as sureties to the bank upon the company's note

of $7,000 and as an arrangement made for providing some additional and necessary capital for their petroleum company's further operation. It is our conclusion, therefore, that he thus signed same believing the representations alleged made him by Isaacs that such was the purpose and reason for the making of this note to him, and that all of the directors would also sign as sureties upon this note, including Isaacs, and become ratably liable thereon just as they were then and had been liable as sureties upon the earlier note of the company for $15,000 given the bank, according to their agreement.

It should be remembered that, at the time of Fix's agreeing to sign, and his signing, this note for $13,500, payable to Isaacs, he and Isaacs each knew, as directors of the petroleum company, that this company was then practically insolvent, and also that at this time he and Isaacs were perhaps the only two of its five directors who were then solvent and sureties upon the company's $7,000 note, then due and owing the bank, and that they two alone, of these five sureties, were the ones who would doubtless have to pay this $7,000 balance owing the bank.

The appellee contends that the making of this new note by these signing sureties to Isaacs constituted a novation of the old debt then owing the bank by them and Isaacs, and that Isaacs was thereby freed of all obligation upon the bank's note as a joint surety thereon, and insists that the new note, thus executed payable to him, effected this alleged change of status, even though the evidence is entirely silent as to any such agreement having ever been made between these parties to the effect that their making of this note to Isaacs was intended to be and constituted a novation of their old surety debt to the bank, with the resulting release of Isaacs from his existing liability thereunder. The appellant, Fix, pleads that his signature to this Isaacs note was secured by fraud, misrepresentation, and a failure of consideration, and therefore that he is not bound by or liable thereon to Isaacs for more than his pro rata share of it, just as was his proportional obligation owing by him, Isaacs, and the other directors, as sureties upon the company's note given and due the bank at the time he signed the Isaacs note here involved and sued on.

The parties to this suit are all immediate parties to these company transactions had between them, out of which the company's note herein sued upon was given Isaacs, and therefore appellant is permitted to plead as a defense the fraud and deceit, if any, which he alleges was practiced upon him by the appellee Isaacs in securing his signature as surety to this note.

It is thus, therefore, our interpretation and analysis of the voluminous and conflicting evidence and our conclusion based thereon that the appellant signed the note in question in the belief that it was to be signed also by the other directors, including the appellee Isaacs, who were all to become sureties and proportionably liable thereon, as alleged was so stated to Fix by Isaacs, when asked by him to sign this note, and as was in keeping with their earlier custom and practice in such matters when indorsing as sureties the company's paper, and that Fix, in thus signing this said oil company's note as a surety, became liable thereunder, as a company surety with Isaacs, equally with the other directors. It appearing, therefore, that he and Isaacs were the only solvent sureties among those five directors signing this company note, we conclude each of them became liable, as co-obligors thereon, for one-half of the amount of this note of $7,048 paid by Isaacs to the bank or $3.524 and also for the further one-half of such part of the $6,000 provided for in this $13,500 note as was by Isaacs thereafter paid over to or furnished the company as additional capital, which amount, we conclude, as Isaacs admitted, did not exceed $4,500, and also one-half of any amount thereafter paid out by him as purchaser from the company of its "stock subscribers" notes.

It clearly appears, however, by the appellee's own testimony, that he made no later purchases from the company of its "stock subscribers" notes, after securing from appellant and the other sureties this $13,500 note.

Holding such opinion, we conclude that the learned chancellor erred in adjudging that appellee recover against Fix, Murphy, and Mitchell the full amount of the note sued on, and are of the opinion that Isaacs should have been allowed to recover against Fix only the sums of $3,524, as one-half of the $7,048 bank debt

paid by Isaacs for the company, and the further sum of $2,250, such being one-half the amount alleged furnished thereafter by Isaacs as additional capital to the company, with interest upon such amounts from date paid by appellee, and further conclude that the appellee is not entitled to recover the $500, or any part thereof, included and provided for in the note of $13,500 as a bonus to be paid Isaacs for his agreement made with his fellow directors to pay this bank debt of the company and for furnishing it the $6,000 additional capital as above stated.

We are convinced that any other holding herein or distribution of liability between Fix and Isaacs, incurred as surety upon this $13,500 company note, would work a great hardship and injustice upon Fix, as it abundantly appears, upon a mature consideration and analysis of the whole evidence, that Fix signed this note, even though payable by its terms to Isaacs, as a surety with Isaacs and other directors, in the justifiable belief induced by Isaacs that he would also sign and be bound thereon with him, in keeping with the usual practice of these directors in indorsing the company's paper, as well as such being the well-understood relationship between them as established by their express written agreement of January, 1926, so stipulating, and each recognized as then existing by Isaacs' own representations to such effect, alleged and appearing made to Fix, to secure his suretyship on the note.

Therefore, such being our analysis of the evidence, it is manifest that to here allow Isaacs to recover the full amount of this note against Fix would be to suffer him, in violation of what reasonably appears was their continued agreement and understanding, had as to their joint liability on the new note when signed, to unload by such fraudulent misrepresentation all the losses, resulting from their company's and cosureties' later insolvency, upon the back of his fellow director, the appellant, Fix, with the result that their agreed plan of cosuretyship would so miscarry in its purpose as to permit his scheme and artifice, in thus securing Fix's signature as surety to this note, to succeed even when known by Isaacs to have been secured with a different understanding on the part of Fix. We are unwilling to so construe the agreement between Fix and Isaacs, upon the evidence here describing the circumstances under

540

which made, as would result in rewarding Isaacs' fraud and deceit practiced upon Fix, by freeing and releasing Isaacs, at Fix's expense, from all liability upon his then existing surety obligation to pay one-half the amount of the company's debt to the bank and also to most profitably realize upon the company's worthless notes by Isaacs, secured in speculative purchase and for which he then knew there was then no personal liability upon Fix to pay any part thereof and to further secure the collection of an unearned bonus of $500 for effecting the claimed arrangement whereby he was to be relieved of his imminent losses, and recoup on his bad investment in the company's stock notes.

Chief Justice Dietzman and Judges Thomas and Rees concur in this opinion to the extent of its adjudging a divided liability upon the note sued upon, between the appellant and appellee, except that they are of the opinion that appellant should be adjudged to pay appellee one-half of the note sued upon of $13,296.50 less the $500 included therein as bonus, or one-half of the sum of $12,796.50 rather than one-half of the lesser amount of $11,548 as hereinabove adjudged recovered by appellee of appellant as being the amount paid by Isaacs for or to the bank out of the $13,500 note given him.

For the reasons hereinabove stated, the judgment of the learned chancellor below is reversed, and cause remanded, with directions to enter judgment in conformity with this opinion.